UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOHN MONTGOMERY,

      Petitioner,

v.                                                    Case No. 3:16cv225-RV-HTC

MARK S. INCH,[1]

      Respondent.

_____/

## ORDER AND REPORT AND RECOMMENDATION

This matter is before the Court on Petitioner John Montgomery's ("Montgomery") amended petition for writ of habeas corpus under 28 U.S.C. § 2254. ECF Doc. 20. The matter was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). Upon careful consideration of the amended petition, the State's response (ECF Doc. 40), and Montgomery's reply (ECF Doc. 49), the undersigned respectfully recommends the Petition be **DENIED** without an evidentiary hearing.

---

[1] Mark S. Inch succeeded Julie Jones as Secretary of the Florida Department of Corrections and is automatically substituted as the respondent. *See* Fed. R. Civ. P. 25(d). The clerk is directed to update the case file information to reflect Mark S. Inch as the Respondent.

## I.    FACTUAL BACKGROUND

Montgomery was charged by an Amended Information on November 23, 2010 containing the following six (6) counts:  (1) burglary of the dwelling portion while armed with a dangerous weapon, a crowbar, in the course of committing the burglary; (2) possession of a burglary tool, the crowbar; (3) resisting an officer with violence; (4) burglary of an unoccupied structure; (5) grand theft ($300 or more, but less than $5,000); and (6) criminal mischief ($200 or less) for damaging a wall when prying off a safe.  ECF Doc. 40-1 at 22.  Montgomery's charges arise out of a burglary of a house and shed belonging to John Wilson.

The testimony presented at trial included the following facts.  ECF Doc. 40-2 at 72 (Trial Transcript).  On the morning of August 26, 2010, Wilson left his home, dropped his kids at the bus stop, and visited his father for about 15 to 20 minutes. *Id.* at 94.  When he returned home, he was surprised to see a dark Jeep Cherokee under the carport.  *Id.*  After he walked into his house, he encountered Montgomery, who he had never seen before, coming around the corner of Wilson's couch with Wilson's safe, which had been bolted into the studs in the wall of his bedroom closet. *Id.* at 95, 107.

When Montgomery saw Wilson, he threw the safe at Wilson, hitting him in the leg.  *Id.*  Montgomery then lunged at Wilson, and the two men wrestled for a few moments.  *Id.* at 96.  Montgomery was able to free himself and left in the Jeep.  *Id.*

Wilson attempted to chase him but was unable to catch him. Wilson called 911 and described the vehicle Montgomery was driving as a blackish-color Jeep Cherokee with the front bumper missing. *Id.* at 97-98.

Within an hour and a half, a deputy on patrol noticed the vehicle and followed it to a house on Bauer Road, where Montgomery parked the vehicle and got out casually. *Id.* The deputy called to Montgomery to "Hold up. Stop. Wait a minute." Montgomery did not and the deputy lost sight of him. *Id.* Montgomery eventually ran into woods behind the house. *Id.* at 114.

The deputy made contact with the homeowner, Greg Stutler, who indicated that a guy he knew named "West" owned the vehicle and had been there the night before at a party. The deputy searched the home and, not finding Montgomery, called for assistance. *Id.* In the meantime, Stutler drove his four-wheeler into the woods, found Montgomery and asked him what was going on. *Id.* at 122. Montgomery said he did not know and asked what he should do. *Id.* Stutler then drove off and returned to his house. *Id.*

Eventually, Deputy Andrew Kilgen and two other deputies (in uniform) tracked Montgomery to a dense thicket where Montgomery was under a log, refusing to come out despite being ordered to do so. *Id.* at 127. Kilgen struggled with Montgomery, and Kilgen attempted to deploy his TASER. *Id.* at 128. Montgomery knocked the TASER aside, so Kilgen used his electrified ASP baton to shock

Montgomery "once or twice" on his back, forcing him to the ground. *Id.* After a few more moments of fighting, the deputies were able to get Montgomery into handcuffs and he became compliant. *Id.*

Later that morning, Wilson was asked by police to come to the Bauer Road house to identify the Jeep Cherokee, which he did as the same car that Montgomery had driven from Wilson's house. *Id.* at 99. In doing so, Wilson also identified other items, which were stored in his shed, in the Jeep, including his floor jack, air compressor, crutches, diving buoyancy compensator and a bottle of his pain medicine with the name "John Wilson" on it. *Id.* Wilson and the police also found Wilson's speargun (which had been in his closet when he left that morning) and a crowbar (that did not belong to Wilson) on Wilson's bed. *Id.* at 107.

Corroborating Wilson's testimony regarding the safe, a police crime scene technician testified that the safe had a screw protruding from it, and the wall in the closet was damaged with holes in it. *Id.* at 138. Additionally, according to Wilson, there was $20 damage to the wall of the closet. *Id.* The air compressor, floor jack, buoyancy compensator, and safe together were worth around $750, and the safe contained a gun worth around $500, paperwork, and over $4,000 cash. *Id.* at 100-101.

Montgomery also testified on his own behalf at trial and offered a very different account of the events of August 26, 2010. Montgomery testified a friend

named Guy Haley called and offered him $50 if he would help Haley pack up some stuff into the Jeep and drive with him to Lillian, Alabama. *Id.* at 171. Haley had a van full of his belongings and asked Montgomery to borrow the Jeep to carry some additional items. *Id.* A man named "Rickey" was also going to help Montgomery and Haley. *Id.* at 172.

The three men met at a nearby store and proceeded to Wilson's house where Montgomery had never been before. *Id.* They entered through an unlocked door and Haley sent Rickey to get some items from a shed. *Id.* at 174. Haley went back to the bedroom for a while and, when he emerged, asked Montgomery to move the safe out to the van while Haley backed the van up. *Id.* Montgomery did not suspect any wrongdoing by Haley but admitted that "Guy Haley, he runs pawn shops and stuff. I should never have helped him." *Id.*

Polk interrupted and asked him about his psychiatric medication, and, over the State's objection, Montgomery was allowed to answer that he had not taken them in the days leading up to August 26, 2010, and that missing his medication could have "serious effects" upon his "ability". *Id.* at 176.

Montgomery testified that when he encountered Wilson, Wilson jumped over the safe at him and started hitting Montgomery. *Id.* It was only then that Montgomery realized something was wrong. *Id.* They scuffled for around five seconds before Montgomery got loose and left in the Jeep. *Id.* at 177. Montgomery

denied he could have thrown the safe at Wilson because he had two herniated discs in his back. *Id.* Instead, he was moving the safe on wheels, scooting it while waiting for Haley to return. *Id.*

He did not see Rickey or Haley or the van outside the property when he left. *Id.* at 178. Wondering where Rickey and Haley had taken off to, Montgomery drove around trying to find them. *Id.* at 180. He headed to the house on Bauer Road because he thought the people who lived there might know where Haley was. *Id.*

Regarding his interaction with the deputies, Montgomery testified he did not hear the deputy who told him to stop before he ran into the woods. *Id.* When asked why he ran into the woods when approached by officers, Montgomery told the jury that "for me to give that answer, I'd have to say something about my mental health, and I have been -- " At that point, the court interrupted and ordered, "Sir, don't say that." *Id.* at 181. Polk then interrupted and asked if he was feeling fear at that point, and Montgomery said that he was. *Id.* Montgomery did not testify about his mental health; instead, he then testified that the deputy shocked him several times with the ASP baton even though Montgomery was immediately compliant. *Id.*

On cross-examination, Montgomery admitted he was in the house while it was occupied, that he was moving the safe, that he had an altercation with Wilson, that Montgomery was driving a black Jeep, and that all the furniture and pictures were still in the house. ECF Doc. 40-2 at 182-86. When asked about the crowbar,

Montgomery denied it was his or that he used it to pry the safe off the wall; he alleged that the crowbar was probably already there, and that Haley had used it to remove the safe from the wall. *Id.* at 183. Montgomery also testified he did not know about the things in the Jeep, including the prescription bottle with Wilson's name on it, because Haley or Rickey had put them there. ECF Doc. 40-2 at 185 & ECF Doc. 40-3 at 11-12.

Montgomery also admitted on cross-examination he had spoken with the deputy who read him his *Miranda* rights shortly after he was apprehended and did not mention Haley or tell the deputy that he was helping someone move. ECF Doc. 40-3 at 2. Also, Montgomery admitted he was given the chance to speak during his first appearance and did not mention Haley or that he was helping someone move at that time either. *Id.* at 10. Instead, during his first appearance, Montgomery said "there was no one in the house," referring to when he first entered the house. *Id.* at 11. After Montgomery's testimony, the defense rested. ECF Doc. 40-3 at 12. No individuals by the name of Guy Haley or Rickey were called to testify.

In its instructions to the jury and on the verdict form for Count 1, the trial court included instructions for Burglary of a Dwelling and three lesser included offenses: Burglary of an Occupied Structure, Burglary of an Unoccupied Structure, and Trespass in a Structure. ECF Doc. 40-1 at 78, 100-101. The court also included the following two interrogatories with each offense on Count 1: (1) whether

Montgomery was armed with a dangerous weapon in the course of committing the offense, and (2) whether Montgomery committed an assault or battery during the course of committing the offense. *Id.* at 100-101. The lesser included offense of assault and battery was not included. The court informed defense counsel of its intent not to give these lesser included offense instructions, and defense counsel, Eugene Polk ("Polk"), did not object. ECF Doc. 40-3 at 13-14.

The jury found Montgomery guilty of all six (6) counts and he was sentenced on April 21, 2011 as follows: Count 1: life imprisonment as a prison releasee re-offender, ECF Doc. 40-4 at 132-33; Counts 2, 4, and 5: five years imprisonment on each count, concurrent with each other and with Count 1, *id.* at 135; and Counts 3 and 6: time served, concurrent to all other counts and each other. *Id.* at 129.

## II.    PROCEDURAL HISTORY

Montgomery filed a direct appeal on May 18, 2011,[2] which was affirmed on April 26, 2012. ECF Doc. 40-4 at 36. Rehearing was denied on June 5, 2012. ECF Doc. 40-4 at 47. The court's mandate issued June 21, 2012. ECF Doc. 40-4 at 49. Montgomery then filed a petition for writ of habeas corpus with the First District Court of Appeal ("First DCA") on September 12, 2012, asserting ineffective assistance of appellate counsel. ECF Doc. 40-4 at 51. The First DCA denied the

---

[2] The initial brief of appellant is at ECF Doc. 40-3 at 152; the appellee's answer brief is at ECF Doc. 40-3 at 204; the reply brief is at ECF Doc. 40-4 at 16.

petition, *per curiam* and without a hearing, on October 8, 2012.  ECF Doc. 40-4 at 63.  Rehearing was denied November 19, 2012.  ECF Doc. 40-4 at 69.

On March 21, 2013, Montgomery filed a *pro se* motion for postconviction relief pursuant to Fla. R. Crim. P. Rule 3.850.  ECF Doc. 40-4 at 139.  On September 10, 2013, Montgomery submitted to prison mail officials an amended motion for postconviction relief.  ECF Doc. 40-4 at 168.  On October 21, 2013, Montgomery submitted to prison mail officials his "Supplemental Post-Conviction Claims."  ECF Doc. 40-5 at 42.  The state judge consolidated the motions and supplement and ordered the State to respond to the amended petition and supplemental claims.

On December 4, 2014, the court held an evidentiary hearing on the following seven (7) grounds of ineffective assistance of counsel: (1) failing to request a jury instruction on the lesser included offense of assault and battery; (2) failing to call Guy Haley as a witness; (3) failing to fully investigate Montgomery's sanity at the time of the offense; (4) failing to file a notice to rely on a defense other than insanity; (5) failing to cross-examine the victim about Guy Haley; (6) failing to have Montgomery's competency evaluated by an independent expert immediately before trial; and (7) failing to move to dismiss Count 4 on the basis of Double Jeopardy. ECF Doc. 40-5 at 156-57.  Grounds 1-6 are also before this Court.

During the hearing, licensed mental health counselor Dr. Bingham testified he examined Montgomery on November 1, 2014, and November 13, 2014, regarding

his mental condition at the time of the offense and competency to stand trial. ECF Doc. 40-5 at 160. Dr. Bingham's report is attached at ECF Doc. 40-7 at 131. Additionally, Polk also testified.

The trial court granted the motion only with regards to the Double Jeopardy argument and denied it in all other respects.[3] ECF Doc. 40-6 at 25-37. The denial of the motion for postconviction relief was affirmed, *per curiam* without opinion, on November 9, 2015. ECF Doc. 40-7 at 57. Rehearing was denied on January 28, 2016, ECF Doc. 40-7 at 82, and a motion for clarification was denied on February 15, 2016, *id.* at 84. The mandate was issued March 2, 2016. *Id.* at 86.

On November 13, 2016, Montgomery filed a second Rule 3.850 motion in the trial court based on newly discovered evidence. ECF Doc. 40-7 at 88. On January 9, 2017, Montgomery amended that motion. ECF Doc. 40-9 at 24. He then filed a supplement to that motion on September 25, 2017. *Id.* at 152. In his second motion, Montgomery claimed he first received Dr. Bingham's report before the December 2014 evidentiary hearing. ECF Doc. 40-7 at 97. In the report, Dr. Bingham noted that the seriousness of Montgomery's head injuries from a vehicle crash immediately prior to the criminal offenses was never determined. *Id.* at 145. Montgomery argued the report should have been explored to provide a possible mental health defense.

---

[3] Montgomery argued the conviction on the burglary of the shed in Count 4 violated double jeopardy violation because the shed was considered part of the dwelling covered by Count 1. *Id.* at 36.

*Id.* at 97.  He also claimed that the Department of Corrections had given him a diagnosis of post traumatic brain injury and PTSD.  *Id.* at 98.

The state court denied the motion on July 5, 2018, finding that the issues were procedurally barred because they should have been brought on direct appeal and the evidence relied upon was not newly discovered evidence.  ECF Doc. 40 at 5.[4] Petitioner filed a motion for rehearing, which was denied.  ECF Doc 40-10 at 3.  The First DCA issued a *per curiam* affirmance April 15, 2019.  *Id.* at 34.  Petitioner filed a motion for rehearing *en banc* and issuance of a written opinion, *id.* at 37, which was denied.  *Id.* at 48.  The First DCA issued the mandate May 13, 2019, and issued the order denying rehearing on June 4, 2019.  *Id.* at 44-48.

Montgomery filed the instant federal petition protectively, on May 22, 2016, before his state proceedings were finalized.  ECF Doc. 1.  The petition was amended on March 9, 2017. ECF Doc. 20.  On May 9, 2017, the Court stayed the federal action to allow the state remedies to be exhausted, which took an additional two (2) years.  ECF Doc. 25.  On June 20, 2019, the Court lifted the stay and directed the State to file a response.  ECF Doc. 39.  The State did so, at ECF Doc. 40, and after

---

[4] In its answer, Respondent states, "The State court denied the motion on July 5, 2018 (Ex. BB, pgs. 304-310)."  However, Ex. BB is found in ECF Doc. 40-9 and only runs to page 302.  ECF Doc. 40-9 at 190; 40-10 at 1.  However, the Court obtained the order from the Escambia County Clerk & Comptroller Website, and it will be docketed as an exhibit to this Report and Recommendation.
The order is available at: http://public.escambiaclerk.com/BMWebLatest/Home.aspx/Search.

an extension for the appearance of counsel, Montgomery filed a reply on January

17, 2020 (ECF Doc. 49).

## III.   STANDARDS OF REVIEW

### A.   Federal Review Of State Court Decision

Under the standard of review for a § 2254 motion, this Court is precluded

from granting a habeas petition on these claims unless the state court's decision (1)

"was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court," or (2) "was based on an

unreasonable determination of the facts in light of the evidence presented in the State

court proceeding."  28 U.S.C. § 2254(d).

The United States Supreme Court set forth the framework for a § 2254 review

in *Williams v. Taylor*, 529 U.S. 362 (2000).  *See id*., at 412-13 (O'Connor, J.,

concurring).  Under the *Williams* framework, a federal court must first determine the

"clearly established Federal law," namely, "the governing legal principle or

principles set forth by the Supreme Court at the time the state court render[ed] its

decision."  *See Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  The law is "clearly

established" only when a Supreme Court holding at the time of the state court

decision embodies the legal principle at issue.  *See Thaler v. Haynes*, 559 U.S. 43,

47 (2010).  Once the governing legal principle is identified, the federal court must

determine whether the state court's adjudication is "contrary to" the identified

governing legal principle or the state court "unreasonably applie[d] that principle to the facts of the [] case." *See Williams*, 529 U.S. at 412-13 (O'Connor, J., concurring).

### B.    Legal Standard For Ineffective Assistance Of Trial Counsel ("IATC")

Montgomery's amended petition includes five (5) claims of IATC.  To prevail on these claims, Montgomery must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 688 (1984), requiring that he show both deficient performance (counsel's representation fell below an objective standard of reasonableness) and prejudice (there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different).

A counsel's performance is deficient only if counsel's "identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.  The deficient performance prejudiced the defendant only if the reasonable probability of a different result rises to a level that is "sufficient to undermine confidence in the outcome." *Id.* at 694.  To prevail on a claim of ineffective assistance of counsel, both parts of the *Strickland* test must be satisfied. *Bester v. Warden, Att'y Gen. of the State of Ala.*, 836 F.3d 1331, 1337 (11th Cir. 2016) (citing *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000)), *cert. denied*, ─── U.S. ─

——, 137 S.Ct. 819 (2017).  However, a court need only address one prong, and if it is found unsatisfied, the court need not address the other prong.  *Id.*

## IV.    GROUNDS FOR RELIEF

Montgomery's petition is premised on eight (8) grounds, which include five (5) claims of IATC, two (2) claims of error by the trial court and one (1) cumulative error claim.  As an initial matter, the State concedes that Montgomery has exhausted all but one of his claims and that his petition is timely filed.  For the reasons set forth below, the undersigned finds that the state court's adjudication of these same claims was not contrary to clearly established federal law or based on an unreasonable application of the facts to the law.  *See* 28 U.S.C. § 2254(d).  Additionally, the undersigned finds that Ground Four of the amended petition is procedurally barred.

### A. Ground One: IATC For Failing To Move For A Judgment Of Acquittal On The Armed Burglary Count Due To Lack Of Evidence That The Crowbar Was Used As A Dangerous Weapon

Montgomery argues trial counsel should have moved for a judgment of acquittal on the armed burglary count because there was no evidence he was armed with a dangerous weapon or used the crowbar as a dangerous weapon.  Because the First DCA issued a *per curiam* affirmance of the denial of the Rule 3.850 Motion, the undersigned will "look through" that decision to the state court's Order Denying Motion for Post-Conviction (the "State's 3.850 Order").  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); ECF Doc. 40-6.

The state court denied relief on this ground, finding there was sufficient circumstantial evidence in the record "to indicate that Defendant possessed the crowbar and used it as a burglary tool to pry the safe off the wall, and it was a question for the jury to decide if the crowbar was a deadly weapon, a burglary tool, or both." ECF Doc. 40-6 at 28. Although Wilson testified the crowbar did not belong to him, there was also evidence presented showing that the crowbar was found on a bed, near where the safe had been pried off the wall, and Wilson confronted Montgomery with the safe. *Id.* Thus, the trial court determined that regardless of how the motion for acquittal was worded, it would not have been granted because such a motion should be granted only if there is no view of the evidence from which a jury could make a finding contrary to that of the moving party. *See Jeffries v. State*, 797 So. 2d 573, 580 (Fla. 2001).

In Montgomery's reply (ECF Doc. 49), he argues that under Florida law, when a case is based solely on circumstantial evidence, the State must present sufficient evidence that is inconsistent with any reasonable hypothesis of innocence for the conviction to be sustained. ECF Doc. 49 at 12-13 (citing *State v. Law*, 559 So. 2d 187 (Fla. 1989)). According to Montgomery, the State did not meet this standard because Montgomery offered testimony disputing that the crowbar belonged to him or that he used it and that Haley was the one who used the crowbar. Thus, according to Montgomery, "the State failed to introduce competent evidence that was

inconsistent with Petitioner's theory of events, as required to overcome an acquittal." *Id.*

The undersigned finds that Montgomery is not entitled to relief on this ground. Under Florida law, "a motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." *State v. Law*, 559 So. 2d 187, 188–89 (Fla. 1989). However, "it is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. . . . The state is not required to rebut conclusively every possible variation of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events." *Id.* (citing *Toole v. State*, 472 So.2d 1174, 1176 (Fla. 1985)). "Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt." *Id.*

As stated above, the evidence presented to the jury included that the crowbar was found on a bed, near where a safe had been pried off a wall, that Wilson was found with the safe, that no one else was at the house when Wilson arrived, and Wilson did not see any vehicles speeding away. Also, Montgomery admitted on

cross-examination that he did not mention Haley, Richey or anyone else he was trying to help move until his testimony at trial, even though he had multiple chances to do so prior to trial. Thus, it was reasonable for the trial court to conclude that there was sufficient evidence for the jury to determine that Montgomery used the crowbar and that the crowbar was a deadly weapon.

Additionally, a determination of whether the State's evidence was legally sufficient to survive an acquittal motion under Florida's circumstantial evidence standard is solely within the province of the Florida courts. "[S]tate courts are the ultimate expositors of state law," and federal courts must therefore abide by their rulings on matters of state law. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (citations and footnote omitted); *Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983). Thus, the undersigned defers to the state court's determination that there was no legal basis for a motion for judgment of acquittal under Florida law.

The undersigned also finds unpersuasive Montgomery's argument that he is entitled to an evidentiary hearing on this issue because trial counsel's motion for acquittal was boilerplate and general and did not raise to the court's attention what evidence was insufficient (or how so). Montgomery's argument overlooks the trial court's explanation in denying this ground for relief in the 3.850 order. As stated above, the trial court determined that the evidence presented to the jury, including evidence related to the crowbar was, in fact, sufficient to support the jury's

determination. Thus, it did not matter how the motion for acquittal was worded because it would have nonetheless failed.

Because a motion for acquittal would not have been successful, Montgomery cannot satisfy either the performance or prejudice prong under *Strickland*. *See Knowles v. Mirzayance*, 556 U.S. 111, 126-27 (2009) (the law does not require counsel to raise every available non-frivolous defense); *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) (counsel is not ineffective for failing to raise a non-meritorious objection); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) (noting that "a lawyer's failure to preserve a meritless issue plainly cannot prejudice a client.").

### B. Ground Two: IATC For Failing To Request A Jury Instruction On The Lesser Included Offenses Of Trespass And Assault Or Battery

Montgomery argues counsel was ineffective for failing to request a jury instruction on the lesser included offenses of trespass and assault or battery as to the armed burglary count. Again, the undersigned will look through the First DCA opinion to the State 3.850 Order, which rejected this ground on two bases. First, the trial court relied on *Sanders v. State*, 847 So. 2d 504, 507 (Fla. 1st DCA 2003) *affirmed by Sanders v. State*, 946 So. 2d 953, 959 -960 (Fla. 2006), and found that Montgomery cannot show prejudice since the jury found every element of the greater offense proven beyond a reasonable doubt. In such a scenario, the only way the jury

could opt for the lesser included offense would be to ignore the law as instructed or their oaths as jurors. ECF Doc. 40-6 at 27. Second, the trial court held an evidentiary hearing on this issue and found "credible" defense counsel's testimony that his decision to agree to the omission of a lesser included offense might have been an instance of a "classic defense attorney dilemma" to argue "all or nothing." *Id.* at 27-28.

In *Sanders,* the Florida Supreme Court held that under *Strickland*, a defendant cannot, as a matter of law, demonstrate prejudice by relying on the possibility of a jury pardon by convicting the defendant of a lesser offense when it has convicted the defendant of the greater offense. *See Sanders*, 946 So. 2d at 956. Thus, the undersigned cannot say that the state court unreasonably applied *Strickland* in concluding that defense counsel's failure to request jury instructions on the lesser-included offenses did not prejudice Montgomery's defense. *See Santiago v. Sec'y, Fla. Dep't of Corr.*, 472 F. App'x 888, 888-89 (11th Cir. 2012) (citing *Sanders*, 946 So. 2d at 958).

Montgomery argues in his reply that *Sanders* does not abdicate *Strickland* and that the court must still apply the *Strickland* standard. The undersigned, however, does not find that the trial court failed to adhere to the *Strickland* standard in its decision. Instead, what the trial court did was use the law in Florida, i.e., *Sanders*, to determine if trial counsel's performance was deficient under *Strickland*. In other

words, if there is "no substantial possibility" that the jury would have returned a guilty verdict on the lesser included offense because to do so would mean that the jury would have to abdicate its oath and obligation, as the trial court determined, then there can be no prejudice under *Strickland.*

Also, the second prong of the state-court judge's reasoning – that counsel made a reasonable strategic choice to go "all or nothing" on the greater offense – is reasonable and consistent with *Strickland*.   As a general matter, a high level of deference is accorded an attorney's strategic decisions.  *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 551 (11th Cir. 2015) (citing *Strickland,* 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable....")).   Given the high deference accorded to strategic decisions *and* a state court's determination, it is the "'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'   And, for the reasons we have already discussed, it is rarer still for merit to be found in a claim that challenges a strategic decision of counsel."  *Id.* (quoting *Johnson v. Sec'y, DOC*, 643 F.3d 907, 911 (11th Cir. 2011)).

Under counsel's strategy, by not giving the jury the option to find Montgomery guilty of the lesser included offense, Montgomery could have had a chance at acquittal.  Accordingly, the undersigned finds Montgomery is not entitled

to federal habeas relief on this claim and that a second evidentiary hearing on this issue is not warranted.

### C. Ground Three: Two Arguments Involving Closing Argument

Ground Three of Montgomery's amended petition contains two arguments. The first is drafted in the alternative as either a fundamental error by the trial court or ineffective assistance of counsel. The second is fundamental error by the trial court. Both arguments deal with the parties' closing arguments. The undersigned finds that neither warrants relief.

1. Argument 1: The trial court erred in allowing the prosecutor to make improper statements during closing argument, or alternatively, trial counsel was ineffective for failing to object.

Montgomery argues the trial court committed fundamental error by allowing the prosecutor to misstate facts not in evidence, which negated Montgomery's defense. Alternatively, he argues trial counsel was ineffective for failing to object to the prosecutor's misstatements. Specifically, Montgomery takes issue with the following three statements in the State's closing argument: (1) that Montgomery "went there that day knowing he was going to break into that house"; (2) that the victim came home and found Montgomery "having that weapon, having something that he can use against him"; and (3) that there were no fingerprints of Guy Haley or "Ricky" found at the crime scene. ECF Doc. 20.

Montgomery argues the first statement implies there was a forced entry into the house, in the absence of such evidence. The second statement implies Montgomery was carrying the crowbar when the victim came home, when the testimony was that it was on the bed. The third statement implies that the State searched for and found no prints for Haley and Rickey, when the State never attempted to match unidentified prints found at the scene to anyone other than Montgomery.

Because there is no written opinion setting out the state court's reason for denying this ground of relief, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principle to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Additionally, the Supreme Court stated in *Richter* that "where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.* at 98.

Prosecutorial remarks compel habeas corpus relief only if the remarks are, first, improper, and, second, so egregious that the proceeding is rendered fundamentally unfair. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)*; see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone

of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").  The relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181 (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Tucker v. Kemp*, 802 F.2d 1293, 1296 (11th Cir. 1986) (en banc) ("If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair."), *cert. denied*, 480 U.S. 911 (1987).

For example, in *Muhammad v. McNeil*, the prosecutor referenced facts not in evidence during his closing argument by stating that the police were able to identify Muhammad's car based on the license plate, even though such evidence previously had been ruled inadmissible.  352 F. App'x 371, 374 (11th Cir. 2009).  The Eleventh Circuit agreed with Muhammad that the prosecutor's comment was improper but found "[i]n light of the record, it does not appear that the comment referring to the license plate, although improper, rendered the trial fundamentally unfair in violation of due process.  In light of the overwhelming evidence of guilt, coupled with defense counsel's failure to contemporaneously object, the prosecutor's improper and isolated comments did not render this trial fundamentally unfair."  *Id.* at 377; *see also Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1182 (11th Cir. 2010)

(comment by prosecutor that victim possessed a rifle due to fear of defendant was improper because such evidence had been previously excluded; however, although the comment was improper, it did not deprive the defendant of a fair and impartial trial or materially contribute to the conviction).

In Montgomery's case, the jury was instructed to not treat anything the lawyers say as evidence, lessening the risk that the prosecutor's comments impaired the jury's rational consideration of the evidence. Also, the comments made by the prosecutor were only a minor part of the State's closing argument, and an even smaller part of the State's entire case. The victim identified Montgomery in court, Montgomery admitted to being at the house, all the missing property was found in Montgomery's car, and Montgomery fled when confronted by police. Montgomery further never mentioned Haley or Rickey when he was questioned by officers and, instead, mentioned them for the first time at trial.

Thus, even if the prosecutor's comments should have been excluded, the undersigned finds that, given the overwhelming evidence against Montgomery, the prosecutor's statements did not render Montgomery's trial fundamentally unfair. Thus, Montgomery cannot meet the high burden of showing that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. Montgomery is not entitled to habeas relief on this claim.

2. <u>Argument 2: The trial court erred in sustaining the prosecutor's objection to statements made by defense counsel during closing argument.</u>

During closing arguments, the prosecutor pointed out that Montgomery had not told the deputy who arrested him or the trial court during first appearance that he was helping Haley move. ECF Doc. 40-3 at 58-59. The prosecutor argued this showed that Montgomery fabricated his story regarding Haley. *Id.* at 59.

In his closing argument, Montgomery's defense counsel attempted to rebut this argument by explaining to the jury why Montgomery did not tell the deputies or the court about Haley as follows:

> When you take into account some of the other issues that you heard about him, he's off of his meds. It's entirely understandable. It's reasonable that he would panic instead of doing -- it's very easy for us to look back in retrospect and say, "Oh, sure" -- he should have said, "Oh, excuse me, I'll step outside and wait for the officers to arrive." Yes, as a rational citizen standing here today with nobody pointing a gun at me in a pleasant, air-conditioned room and wearing comfortable clothes, it's very easy to say that's what he should have done. Okay. I ask you, please, to consider how you would have felt under the circumstances and then suddenly –

ECF Doc. 40-3 at 71. Before defense counsel could finish, the prosecutor objected, citing Florida's "Golden Rule." ECF Doc. 40-3 at 71. Montgomery responded that this was not a "Golden Rule" argument, but the court sustained the objection. *Id.*

Montgomery argues the trial court committed constitutional error because (1) the "Golden Rule" theory under Florida law applies only to a prosecutor asking a jury to put itself in the shoes of the victim, while defense counsel referred to the

defendant, not the victim, and (2) by sustaining the objection the Court prevented Montgomery from asserting his defense that he was not there with a dangerous weapon or to commit a crime.  He concludes that this error, combined with the prosecutor's misconduct, discussed above, and the court's decision barring Montgomery from discussing his mental health issues at the time of the offense,[5] resulted in irreparable damage to his ability to mount a defense.  ECF Doc. 20 at 30.

As with Montgomery's first argument under Ground Three, the state court did not issue a written opinion when denying this claim.  Thus, Montgomery must show "there was no reasonable basis for the state court to deny relief."  *Richter*, 562 U.S. at 98.

Most constitutional mistakes call for reversal only if the government cannot demonstrate harmlessness.  *Neder v. United States*, 527 U.S. 1, 8 (1999).  Only the rare type of error—in general, one that "'infect[s] the entire trial process'" and "'necessarily render[s] [it] fundamentally unfair'"— requires automatic reversal.  *Id.* In this regard, "[i]mproper restriction of closing argument qualifies as a trial error (a mistake reviewable for harmlessness) rather than a structural error (a mistake that

---

[5] Shortly before Montgomery testified, the court instructed him that because there has not been a notice of competency, incompetence, or insanity filed, Montgomery was not to testify about hearing 'voices growling, snapping,' or whatever, that would not be that's trying to put insanity out there," and his testimony was "not an opportunity for [him] to indirectly say, 'I was insane at the time of the offense….'"  Despite this instruction, however, the court did allow Montgomery to talk about being off his medications.

ECF Doc. 40-2 at 165.

requires automatic reversal)." *Glebe v. Frost*, 574 U.S. 21, 22–23 (2014). Thus, a reasonable basis for the state court to deny relief would be that regardless of whether the court erred in sustaining the objection, the error was harmless.

The undersigned finds in this case that regardless of whether the trial court erred in sustaining the objection, the error was harmless. First, the objection was not made until after counsel had reminded the jury that Montgomery was off his medications and argued that it is was reasonable to expect him to panic in the situation he was in. The jury was also able to hear counsel argue that it is easy for someone to sit in the courtroom today and say what should have been done. Also, even after the objection was sustained, Montgomery's counsel asked the jury, "At any rate, consider how the individual involved would have reacted under the circumstances, all of them." ECF Doc. 40-3 at 72. Thus, while the objection may have precluded counsel from completing his sentence of asking the jury how they would have acted in Montgomery's shoes, it did not prevent counsel (or Montgomery) from mounting a defense. Moreover, Montgomery testified he panicked because of surprise, fear and the fact he was off his medications. Thus, any error in sustaining the objection was not the type that "'infect[s] the entire trial process'" and "'necessarily render[s] [it] fundamentally unfair.'" *Glebe*, 574 U.S. at 22–23.

**D. Ground Four: The Trial Court Erred In Failing To Make A Proper Competency Determination Or Hold A Proper Competency Hearing After Finding Reasonable Grounds For A Mental Health Assessment**

Montgomery contends the trial court erred in (1) not holding a competency hearing; (2) not appointing a mental health expert for him; and (3) having the court's expert evaluate Montgomery based on an unrelated case. The undersigned finds Montgomery has procedurally defaulted on this claim, *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (*per curiam*) ("[F]ederal courts may treat unexhausted claims as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile."), and has failed to show cause and prejudice, as necessary to overcome a procedural default. *See Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001) (only exception to the doctrine of procedural default is where a petitioner has established "cause and prejudice or the fundamental miscarriage of justice,").

Generally, if the last state court to examine a claim states clearly and explicitly that the claim is procedurally barred, and that bar provides an adequate and independent ground for denying relief, then federal review of the claim also is precluded by federal procedural default principles. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Cone v. Bell*, 556 U.S. 449, 465 (2009) ("[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules,

the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.").

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim. *Id*. Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *Id*. Third, the state procedural rule must be adequate. *Id*. The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id*.

      1.    <u>The state court stated clearly and explicitly that this claim is procedurally barred.</u>

Montgomery did not raise this ground in his direct appeal, *see* ECF Doc. 40-3 at 149-50 (setting out the issues on appeal). He also did not raise it in his first 3.850 motion, ECF Doc. 40-4 at 168. Instead, Montgomery argued trial counsel was ineffective for failing to investigate and file proper pleadings addressing his mental status at the time of the offense and at trial. Indeed, "claims of trial court error should be raised on direct appeal, not in a rule 3.850 motion." *Swanson v. State*, 984 So. 2d

629, 629 (Fla. Dist. Ct. App. 2008) (citing *Hodges v. State*, 885 So.2d 338, 366 (Fla. 2004)).

It was not until his second motion for post-conviction relief, filed January 8, 2017, that Montgomery first argued the "trial court abused its discretion and made a fundamental error in not conducting a mandatory competency hearing." ECF Doc. 40-9 at 29. Montgomery sought the state court's consideration of this argument on the basis of newly discovered evidence and pointed to the following: (1) details in Dr. Bingham's report, provided to him the last week of November 2014, and Montgomery's new diagnoses of traumatic brain injury and PTSD; (2) the fact that Dr. Benson's report, filed April 5, 2011, was not filed in this case but in another of Montgomery's cases; (3) the case of *The Florida Bar v. Eugene Polk*, 168 So. 3d 230 (Fla. 2015), indicating Montgomery's counsel was having issues of incompetency during the time frame of Montgomery's case; (4) the case of *Trueblood v. State*, 193 So. 3d 1060 (Fla. 1st DCA 2016); and (5) the case of *McWilliams v. Dunn*, 137 S. Ct. 1790 (2017). The state court, however, did not reach the merits of Montgomery's second 3.850 motion, finding, instead, that Montgomery could not show that newly discovered evidence or subsequent changes in case law justified the untimely and successive motion.

First, the court found that the new opinions of experts from previously compiled data do not constitute newly discovered evidence under Florida law. Also,

Dr. Bingham's opinion was submitted to the court and all parties before the evidentiary hearing on Montgomery's first 3.850 motion. Therefore, the details of the report were not newly discovered evidence.

Second, Dr. Benson's report was also filed in the instant case and, even if it had not been, there is no indication that "Defendant [or] his counsel was unaware of Dr. Benson's report at the time of trial." *Id.* at 5. Third, the Supreme Court opinion regarding defense counsel Polk shows only that he was suspended from the practice of law for ninety (90) days because he failed to communicate with and return documents to a different client and "is in no way connected to Defendant's case and therefore is not considered newly discovered evidence. Defendant's ineffective assistance of counsel claims stemming from this opinion are also not newly discovered." *Id.* at 6.

Fourth, the state court also rejected the argument that the new caselaw relied upon by Montgomery warranted relief because neither "announce[d] retroactive application of a newly established fundamental constitutional right." *Id.* at 6. Finally, the state court considered the various claims of ineffective assistance of counsel alleged in the second 3.850 motion and found "the allegations that counsel failed to fully investigate a mental health defense is not evidence, let alone newly discovered evidence." *Id.* at 6-7.

Thus, the state court found that none of the claims made by Montgomery "rise to the level of being considered newly discovered evidence" and that "trial court error is not a cognizable claim for postconviction relief." *Id.* at 6 (citing *Swanson v. State*, 984 So. 2d 629, 629 (Fla. Dist. Ct. App. 2008) (holding that claims of trial error must be brought on direct appeal, not in a 3.850 motion)).   Accordingly, the state court declined to address the merits of the claim or any federal issues potentially involved.

> 2.   The state procedural ground applied by the state court provides an adequate and independent ground for denying relief.

As noted above, a claim can be procedurally barred from federal review if the state court declined to consider it based on independent and adequate state procedural grounds.  *See Coleman v. Thompson,* 501 U.S. 722, 729-30 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 85-86 (1977).  The procedurally correct way to raise a claim challenging trial court error is by direct appeal, *see Swanson, supra*, and the procedural bar imposed in Montgomery's case is firmly established and regularly followed in the Florida courts.  *See e.g., Owens v. Fla. Dep't of Corr. Sec'y*, No. 1:16CV254/WTH/EMT, 2018 WL 5794185, at *17 (N.D. Fla. May 1, 2018), *report and recommendation adopted*, No. 1:16CV254-MW/EMT, 2018 WL 5792820 (N.D. Fla. Nov. 5, 2018) ("the state procedural rule, that issues which could have been litigated at trial and on direct appeal, including issues of trial court error

such as the one presented in Ground Five, are not cognizable through a Rule 3.850 motion, is firmly established and regularly followed") (citing Fla. R. Crim. P. 3.850(7)); *Johnson v. State*, 593 So.2d 206, 208 (Fla. 1992) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack."). Also, the Eleventh Circuit has concluded that the procedural requirements of Florida's Rule 3.850 constitute independent and adequate state grounds under applicable law. *LeCroy v. Sec'y, Fla. Dep't of Corr.*, 421 F.3d 1237, 1260 n.25 (11th Cir. 2005) (citing *Whiddon v. Dugger*, 894 F.2d 1266, 1267-68 (11th Cir. 1990)).

Therefore, the state court opinion was based on an independent and adequate state procedural rule and is therefore procedurally defaulted.

      3.    <u>Even under *Martinez v. Ryan,* Montgomery cannot show cause for his procedural default.</u>

In his reply, Montgomery argues the United States Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. 1, 11 (2012), establishes "cause" for this Court to consider this issue. *See Martinez v. Ryan*, 566 U.S. 1, 11 (2012). *Martinez*, however, is inapposite because the Eleventh Circuit, there, addressed whether failure to raise an ineffective assistance of counsel argument in a post-conviction motion necessarily precludes federal habeas review. *See Martinez*, 566 U.S. at 10-11 ("if counsel's errors in an initial-review collateral proceeding do not establish cause to

excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims"). The holding in *Martinez* is that federal habeas review of an ineffective assistance of counsel claim is not procedurally barred "if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* Unlike *Martinez*, the claim for relief the state court found was procedurally barred (and which Montgomery seeks for this Court to review) is a claim of trial court error, and ***not*** ineffectiveness of trial counsel.

In Montgomery's reply, he appears to ignore the fact that his ground for relief is for trial court error and not ineffective assistance of counsel. At best, even if the undersigned were to interpret Montgomery's argument as an ineffective assistance of counsel claim (for failing to raise this ground of trial court error on direct appeal), that is a claim of ineffective assistance of *appellate* counsel and not ineffective assistance of trial counsel. That distinction is important for two (2) reasons. First, ineffective assistance of appellate counsel can and should be raised on direct appeal. *See* Fla. R. App. P. 9.141(d). Second, and more importantly, the Eleventh Circuit has declined to extend *Martinez* to an ineffective assistance of appellate counsel claim. *Luciano v. Sec'y, Dep't of Corr.*, 701 F. App'x 792, 794 (11th Cir. 2017) ("We have repeatedly underscored *Martinez*'s narrow scope and emphasized that *Martinez* applies only to excusing a procedural default of ineffective-trial-counsel claims.").

4.   Montgomery also cannot show prejudice or a fundamental miscarriage of justice.

Montgomery also cannot show prejudice or a fundamental miscarriage of justice.  To satisfy the prejudice or miscarriage of justice exceptions, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  *Schlup*, 513 U.S. at 327, 115 S.Ct. 851.  Further, because a finding that a "constitutional error has caused the conviction of an innocent person is extremely rare, to be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.*

Here, no such evidence has been presented.  Indeed, Montgomery does not even argue he is actually innocent.  Moreover, as stated above, there was overwhelming evidence presented against Montgomery to establish his guilt.  And, to the extent Montgomery contends he is "actually innocent" because he was "guilty by reason of insanity," as discussed below, that argument is also unsupported by the record.

### E. Ground Five: Trial Counsel Was Ineffective For Failing To Develop A Mental Health Defense

Montgomery asserts that counsel "failed to follow proper procedure and to timely file notices to rely on insanity defense and/or intent to rely on a mental health defense other than insanity." ECF Doc. 20 at 34. He also argues that counsel was ineffective for failing "to adequately investigate and develop evidence of his mental health history and problems at the time of charged offense." *Id.* Because the First DCA issued a *per curiam* affirmance of the denial of Montgomery's first Rule 3.850 motion, this Court will "look through" that decision to the State 3.850 Order. ECF Doc. 40-6 at 25.

A review of the record regarding Montgomery's mental health issues shows as follows: In December of 2010, Steve Bayhi[6] successfully moved the court to have Montgomery evaluated by Dr. Gilgun, who authored two reports: one addressing competency to stand trial and one addressing insanity at the time of the offense. ECF Doc. 40-6 at 55. Dr. Gilgun found him to be both competent at the time of the evaluation and sane at the time of the offense. *Id.*

In February of 2011, Montgomery told the court he wished to be evaluated again, and while the court declined to order a court-paid evaluation, the court

---

[6] Petitioner testified that he was originally represented by Steve Bayhi from the public defender's office, who remained on the case "for a long time and then right before trial, like right before my last docket day" he was replaced by attorney Eugene Polk from the public defender's office. ECF Doc. 40-5 at 180-81.

determined that Montgomery was free to get a private evaluation and the court would consider it if he got it back by the jury selection date of March 14, 2011. *Id.* at 55 & 65. Montgomery's second counsel, Polk, represented to the court that over late February and early March 2011, Montgomery's family attempted to retain an expert to re-evaluate Montgomery but were unable. ECF Doc. 40-1 at 45. Thus, as the trial date of March 14 approached, Montgomery had no expert testimony supporting his defense involving his mental state at the time of the offense. *Id.*

On March 8, 2011, the State moved *in limine* to prevent any reference to a defense related to Montgomery's sanity or mental condition at the time of the offense. ECF Doc. 40-5 at 11. The motion noted that under Fla. Crim. Proc. R. 3.216(c) a defendant must file his notice to rely on the defense of insanity no later than fifteen days after his arraignment. *Id.* Montgomery had been arraigned on September 17, 2010 but had not filed such a notice as of March 8, 2011, the date of the motion. *Id.* Also, Fla. Crim. Proc. R. 3.216(e) requires that Montgomery give a notice to rely on any other mental health defense no later than thirty days prior to trial. Jury selection was set in the case for March 14, 2011, which was six days after the motion. *Id.*

On the same day, the State filed a motion for discovery sanctions against Montgomery for failing to disclose the names and contact information of several witnesses in a timely manner. ECF Doc. 40-1 at 36. The Court held a hearing on

the motion for sanctions on March 10, 2011, and the hearing also ended up addressing the issues in the motion *in limine*. *Id.* At the hearing, counsel for Montgomery admitted that the witnesses would only be called to testify about "his mind state and would have backed up testimony concerning his sanity at or around the time of the alleged offenses." *Id.* As such, the court held that the witnesses could not testify because (1) no notice of intent to rely on insanity or any other mental condition as a defense had been timely filed and (2) no proposed testimony of an expert supporting a defense based on Montgomery's mental status at the time of the offense had been offered by Montgomery. *Id.* at 22-24. Instead, the only psychological testimony in the record concerning Montgomery's sanity at the time of the offense was Dr. Gilgun's finding in December 2010 that Montgomery was sane at the time of the offense. *Id.* at 55.

The trial court held a pretrial hearing on March 14, 2011, during which defense counsel Polk told the court that he believed his client might be decompensating and might now not be competent to stand trial. ECF Doc. 40-6 at 53. Polk stated, "He's talked to me about hearing growling from the earth, voices reading Biblical passages to him, and other such things." *Id.* Polk noted that "medications that he had been previously taking that were working and keeping him stable, the jail was not providing those. It is a different set of medications that apparently are not as effective." *Id.* at 54. The trial court found that Montgomery

was not being genuine in his complaints. *Id.* at 56. The court thus declined to take any action and set the matter for jury selection. *Id.*

On March 17, 2011, after the jury was selected but not yet empaneled, Polk filed a renewed motion to appoint mental health evaluators. ECF Doc. 40-5 at 3. A hearing was held during which Polk indicated that Montgomery's symptoms had worsened and might even include organic brain injury. ECF Doc. 40-6 at 60-61. Polk stated that although Dr. Gilgun had re-examined Montgomery within the week and found him competent, Polk questioned the dependability of his report because "[t]here's clearly something going on" between Dr. Gilgun and Montgomery. *Id.* at 62. Specifically, Dr. Gilgun insisted on having Montgomery shackled during the examination, spoke with him only ten minutes at most, and treated the examination "like an interrogation." *Id.* Polk worried that there "may be some frustration with Dr. Gilgun at this point in dealing with Mr. Montgomery." *Id.* at 63.

Nevertheless, the trial court initially declined to appoint mental health experts to re-evaluate Montgomery, finding that the motion was simply a stall tactic. *Id.* at 70-73. Polk responded by exercising peremptory back strikes, causing the jury to have less than six members and forcing the court to delay the trial. *Id.* at 73. The trial court stayed the proceedings and appointed Dr. Benson to examine Montgomery and give an opinion of whether Montgomery was competent to stand trial only. *Id.* at 84. Dr. Benson issued a report, on March 22, 2011, finding that Montgomery was

competent to stand trial and not rendering an opinion on sanity at the time of the offense.  ECF Doc. 40-1 at 66-67.

Despite the extensive efforts Polk made to push the issue of Montgomery's mental state, Montgomery contends in his amended petition that trial counsel was ineffective for "not filing proper motions for disinterested experts" and for not filing notices to rely on "insanity and/or mental health defenses other than insanity", which would have guaranteed Montgomery would be evaluated for mental health defenses by an independent doctor of his choice.  Also, according to Montgomery, counsel neglected to contact his family, which was willing to pay for expert evaluation, to request an unbiased determination of mental health defenses, or move for a continuance to have Montgomery re-evaluated.  ECF Doc. 20 at 35.

After an evidentiary hearing, the state court found that counsel had adequately investigated Montgomery's mental health defense, both Defendant's sanity at the time of the offenses and his competency to proceed to trial.  ECF Doc. 40-6 at 30.  This determination is reasonable and supported by the record.  Montgomery was examined by Dr. Gilgun in December 2010 and determined to be sane.  He was re-examined in March/April of 2011 by Dr. Benson and found to be competent to proceed to trial.  He was examined by Dr. Bingham in 2014 and, again, found to not meet the definition of insanity at the time of the offense.  ECF Doc. 40-7 at 144.

Counsel also testified at the evidentiary hearing that he repeatedly gave Montgomery's family a chance to come through with funding for a private re-examination of Montgomery but, as he advised the state court, Montgomery's family did not come through. ECF Doc. 40-1 at 45. Thus, as the trial date of March 14, 2011 approached, Montgomery had no other expert testimony supporting a defense involving his mental state at the time of the offense. *Id.* Far from not investigating Montgomery's mental health, counsel repeatedly raised the issue to the court.

Second, the state court found that counsel was not deficient in declining to file a notice of relying on an insanity or other mental health defense and in not continuing to attempt to call mental health witnesses. The state court noted that "at the evidentiary hearing on this matter, defense counsel testified that after reviewing the psychological evaluation which reported that Defendant was sane at the time of the offenses, he did not think that a basis for an insanity defense existed" and that "based on his interactions with Defendant and the psychological evaluations that had been done, he did not see any 'non-insanity mental health issue defense' to put forth." ECF Doc. 40-6 at 31. The state court cited the "virtually unchallengeable" nature of strategic decisions of counsel made after a thorough investigation and found that "[c]ounsel thoroughly investigated Defendant's mental health and attempted to put forth a defense to the extent permitted by the circumstances. Defendant is not entitled to relief on this claim." *Id.*

Also, the state court found that Montgomery was not prejudiced because he was allowed to essentially present a mental health defense.  Specifically, (1) he was allowed to testify that he was off his medications at the time of the offense and (2) defense counsel was given some latitude to argue a non-insanity mental health defense.  In his reply, Montgomery asserts he was "not permitted to testify to what specific medications he was prescribed, what the medications were for, or what effects the medications had."  ECF Doc. 49 at 31.  While that may be true, the court permitted Montgomery, over the State's objection, to tell the jury that he suffered fear and "serious effects" from being off his medications.  The undersigned finds that the state court's denial of relief on this ground was not contrary to established law or a misapplication of the law to the facts.  Accordingly, Montgomery is not entitled to relief on this ground.

## F.  Ground Six: Trial Counsel Was Ineffective For Failing To Move For Another Evaluation And A Continuance To Develop The Mental Health Defense

Montgomery argues counsel was ineffective for failing to properly move for another evaluation and a competency hearing prior to trial and properly move for a continuance.  ECF Doc. 20 at 37.  The undersigned finds that the state court's 3.850 Order denying relief on this ground was neither unreasonable nor contrary to established law.

Although defense counsel did not ask for a continuance specifically for the purpose of having Montgomery re-evaluated, defense counsel effectively forced a continuance by exercising five peremptory strikes and decimating the jury panel, which resulted in not only a continuance but the appointment of Dr .Benson.  ECF Doc. 40-6 at 32-33.  Thus, as the state court determined, "counsel was willing to go to great lengths to have the trial continued for Defendant to be re-evaluated. Defendant is not entitled to relief on this claim."  *Id.* at 33.

Additionally, the record shows that defense counsel attempted to get funding from Montgomery's family for a private evaluation of Montgomery.  As the trial court noted, rather than neglecting the issue, counsel put his reputation on the line by using peremptory back-strikes to force the judge into granting a continuance. Also, as discussed above, Montgomery did have the opportunity to tell the jury about the effect of not taking his medications.  Thus, Montgomery cannot show the conduct of counsel prejudiced his case and is not entitled to relief on this ground.

## G.   Ground Seven: Cumulative Effect Of Trial Court And Counsel Errors

Montgomery argues "[t]he numerous errors in this case deprived Petitioner of his right to a fair trial and Petitioner was cumulatively deprived is his right to effective assistance of counsel."  ECF Doc. 20 at 41-43.  The state court determined this claim was "without merit because the Court has considered each claim in his

motion and found none to be a basis for relief."   The First DCA affirmed without written opinion.

The undersigned agrees with the state court's determination that this claim is without merit.  The cumulative effect argument applies only to errors.  *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (holding that cumulative error claim fails in light of the absence of any individual errors to accumulate); *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) (holding that "[w]here there is no error or only a single error, there can be no cumulative error").  Here, the cumulative effect argument does not apply because the alleged errors raised by Montgomery are without merit.

### H.    Evidentiary Hearing

The undersigned finds that an evidentiary hearing is not warranted.   In deciding whether to grant an evidentiary hearing, this Court must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  Additionally, this Court must consider the deferential standards prescribed by § 2254, particularly those that apply when the state court holds an evidentiary hearing, as it did here on the IATC claims raised. *See id.*  Upon consideration, the undersigned finds that the claims in this case can be resolved without an evidentiary hearing.  *See Schriro*, 550 U.S. at 474.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

After review of the record, the Court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing Section 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is ORDERED:

1.     The clerk shall change the docket to reflect that Mark S. Inch has been substituted as the respondent.

And, it is respectfully RECOMMENDED:

1.     That Petitioner's amended petition under 28 U.S.C. § 2254 (ECF Doc. 20) be DENIED, without an evidentiary hearing;

2.     That a certificate of appealability be DENIED; and

3.     That the clerk close this matter.

DONE AND ORDERED this 3rd day of February, 2020.

/s/ Hope Thai Cannon

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  A copy of objections shall be served upon the Magistrate Judge and all other parties. A party failing to object to a Magistrate Judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.